## CHARLES E. SMITH

*v.*

## CHARLES H. MUIRHEID et al.

Upon a judgment recovered in Pennsylvania an attachment was issued out of the supreme court of New Jersey, to reach defendant's interest in certain lands in this state.—*Held*, that a creditor's bill to set aside defendant's conveyance of those lands to his brother, shortly before the action in Pennsylvania was begun, was sustainable under the lien of the attachment, and that the insolvency of the defendant was not a material fact, or necessary to be proved.

Bill for relief.  On final hearing on pleadings and proofs.

*Mr. B. Gummere,* for complainant.

*Mr. A. G. Richey* and *Mr. J. Wilson,* for defendants.

THE CHANCELLOR.

This is a suit in aid of an attachment.  The complainant recovered judgment against the defendant Charles H. Muirheid, in the court of common pleas of Philadelphia, December 31st, 1878, for $18,886.60, on a promissory note for $30,000 and interest, given by the latter to the former, July 10th, 1873, and payable twelve months from date.  He issued a foreign attachment (the defendant in the judgment being a non-resident) out of the supreme court of this state, February 7th, 1879.  By virtue thereof, the property and estate of Charles H. Muirheid, in a farm of two hundred and seventeen and twenty-four hundredths acres, or thereabouts, in Hopewell township, in Mercer county, was attached.  Judgment was entered in the attachment December 9th, 1879, for $19,780.99, besides costs.  The object of this suit is to reach, in aid of the attachment, the interest of Charles H. Muirheid in that property, which, according to the

allegations of the bill, was fraudulently and with intent to hinder and delay the creditors of the grantor, conveyed by Charles H. Muirheid to his brother, the defendant William H. Muirheid, by deed dated March 16th, 1877. The bill waives answer on oath. It appears from the evidence that the farm was owned by John G. Muirheid, the father of the parties to that deed (whose homestead it was), up to his death, which occurred in November, 1866. He left six children and the children of a deceased daughter. Soon after his father's death, Charles purchased the interests of the other children and the children of his deceased sister in the real and personal estate, at $2,000 for each of the six shares. At the father's death the family living on the farm consisted of the widow, a daughter named Sarah, and a son named John and his wife, and William. John and his wife, however, soon moved away.

For the price of the shares of Sarah and William, Charles gave to them together a mortgage on the farm. It was agreed between Charles and William at the time of the purchase that in order to keep the family together on the homestead, William should take charge of the property and cultivate and manage the farm. William says that for this service Charles was to compensate him fully, and that the superintendence and management of the property were to be subject and according to the wishes and directions of Charles, and that Charles was to have the privilege (as William expresses it) of coming to the farm with his family whenever he chose. William says Charles availed himself of the privilege by coming with his wife, her maid, his coachman and horses, and sometimes bringing also a friend of his wife, and they would stay six weeks at a time. This arrangement continued for ten years, up to March, 1877. The widow died, however, in 1872. In March, 1877, Charles agreed to sell the farm and his personal property there to William for $12,000, and he caused a deed for them to be drawn accordingly, and also a mortgage to himself on the same property for the $12,000, the whole of the purchase-money. The deed purported to convey the farm and " all the live stock, farming utensils and furniture, including all manner of personal

property on the farm." It was sent to him at Philadelphia, where he lived, to be executed, and he executed it accordingly.

After it was returned, William executed the mortgage. In May or June, 1877, Charles and William had what the latter calls a " settlement," in which William insisted that the price at which the property had been sold to him was too high, and more than it would bring in the market, and it was accordingly agreed between them that there should be a deduction of $2,000 from the price on that account, the amount to be credited on the mortgage. It was then also agreed that William was entitled to $2,000, or $200 a year, from Charles for his compensation for the ten years' services he had rendered under the agreement for cultivating and managing the farm ; that amount also to be paid by a like credit. It was also agreed that William should have allowance in the same way for the $2,000 secured to him by the mortgage given to him and Sarah by Charles, as before mentioned. The aggregate of these sums, $6,000, was then credited upon the mortgage of $12,000. That mortgage was subsequently assigned to Margaret E. Rhoads, of Germantown, Pennsylvania, by whom it is now held. On the hearing, her title to it as a valid security was not questioned, but admitted.

That Charles H. Muirheid, when he made the conveyance to William, owed the complainant a large sum of money which he was unable to pay, is abundantly proved. It seems quite clear that he was anxious to put the property beyond the reach of his creditors. He made the conveyance only about three weeks before the complainant began suit against him in Philadelphia. He took a mortgage for the whole purchase-money. He sold the property, real and personal, without inventory or appraisement.

The personal property, consisting of live stock, farming utensils, grain &c., appears to have been worth $1,200 at least. In this connection it may be added that the deed purports to convey furniture, when, in fact, Charles owned none there. The reason for that, according to William's statement, was that he might be sure to cover everything. The consideration of the deed, if not fixed by Charles himself alone, was agreed to by

William with so little consideration that the latter, in the settlement, successfully insisted upon a deduction of $2,000 from the price, on the ground that it was so much more than the property would bring in the market. The bill, as before stated, waives answer on oath, and the defendants have not seen fit to produce Charles as a witness. We have therefore no statement on oath from him. William denies all fraud, and testifies that when he bought the property he not only did not know that Charles owed the complainant anything, but did not know that he was indebted to anybody. It is urged in his behalf that in buying the property he was innocent of any design to defraud, and therefore is entitled to hold it against the complainant and all other creditors of Charles. And it is further insisted that, inasmuch as it is not made to appear that Charles is insolvent, William cannot be disturbed in his title to the property by the complainant in this suit. As to the first point: A conveyance, to be good against existing creditors, must be upon good consideration and *bona fide* also. It is not sufficient that it be upon good consideration or *bona fide*—it must be both; and if it be defective in either particular, although valid between the parties and their representatives, it is invalid as to existing creditors. *Sayre* v. *Fredericks, 1 C. E. Gr. 205 ; Randall* v. *Vroom, 3 Stew. Eq. 353 ; Story's Eq Jur.* § *353.* In view of the circumstances it is difficult to believe that William had not, when the conveyance was made, any knowledge or understanding that there was a reason arising from, or connected with, Charles's pecuniary embarrassments, for the transfer which was apparently suddenly, if not hastily, made on the part of Charles; and it was certainly inconsiderately accepted on William's part.

It is urged that such knowledge on the part of the grantee will not make a transfer fraudulent as against creditors, even though the grantor's design was fraudulent, and *Merchants Bank* v. *Northrup, 7 C. E. Gr. 58,* is cited as an authority; but, in that case, it appeared that a valuable consideration was paid, and that the conveyance was *bona fide,* and what was said by the court on the subject of knowledge had express reference to a case where there was a *bona fide* conveyance for valuable

consideration. In the case in hand, William had never sought to buy the property. The proposition to sell came from Charles, and it appears to have been acted upon at once, and, on the transfer, William gave Charles a mortgage for the whole of the purchase-money, although, as he says, Charles at the time owed him $2,000 on the mortgage given to him and Sarah by Charles for purchase-money, and was indebted to him in a large sum for his services. There is further reason to conclude that the transfer was not *bona fide* on the part of William in the allowance of $2,000 made to him with respect to his services, just referred to, as superintendent and manager of the farm. He testifies that he had, during all those ten years, the entire products of the farm, except what went for the supply of the table. He kept no account of them. He never rendered any account of his stewardship, and it does not appear that any was ever required of him. The family, after the death of the mother in December, 1872, consisted of only himself and his wife and his sister Sarah. He never made any demand on Charles for compensation, and Charles never paid him anything on account of it. He had no written evidence of the agreement on which the claim was based. Even in the settlement of 1877 there was no account of his receipts or expenditures. On the allowance of $2,000 for services, no receipt or discharge was taken, except, perhaps, in the endorsement of the credit, which is not before me. That allowance, on account of the consideration, cannot be regarded as having been made *bona fide.* There is too much evidence of fraud in the transaction to permit the conveyance to stand as valid as against the complainant.

As to the second point, that it does not appear that Charles is insolvent, the complainant comes, as before stated, into court, to obtain its assistance in aid of the lien he has obtained under the attachment. His bill is filed for the benefit of himself and such other creditors of Charles as shall join in this suit. It merely seeks to remove a fraudulent deed and mortgage out of the way of the attachment. It has repeatedly been decided that such a suit is maintainable. *Williams* v. *Michenor, 3 Stock. 520 ;*

Smith *v.* Muirheid.

*Roberts* v. *Hodges, 1 C. E. Gr. 299 ; Curry* v. *Glass, 10 C. E. Gr. 108.* In *Williams* v. *Michenor* it was said :

" The aid of this court is sought to disembarrass the title of the difficulties which the debtor has thrown around it for the purpose of defrauding his creditors. If the auditor should sell the property as the title now stands, with the defendant's interest in the property uncertain and a matter of con- troversy, and with claims upon it unadjusted, it is manifest the property must be sacrificed. This court can relieve the title of all such difficulties. It can adjust all claims upon the property, and secure their payment. It can ascer- tain what interest the defendant has in the property, and what portion of it ought legally and equitably to be sold under the attachment. It is for the benefit of all parties interested that this should be done before the property is sold. It can be done only by this court. This court alone can make the attachment of any real advantage to the creditors. Its aid is properly invoked to assist the complainants in their legal remedy."

It is obvious that in such a suit as this it is a matter of no importance whether the debtor is insolvent or not. The com- plainant is entitled to the assistance of this court in aid of his legal remedy. The property should be sold subject not only to the amount due Mrs. Rhoads on the mortgage of $12,000, but also to the money due William on the mortgage given to him and Sarah, and the proceeds applied to the payment of the judgment. in attachment. By the answer it is said that there was a little over $2,000 due William on the latter mortgage at the settlement in 1877. It does not appear whether the claim of Sarah to $2,000 and interest under that mortgage has been in any way satisfied. She is not a party to this suit. By the answer it is stated that on the settlement between William and Charles, in 1877, that mortgage was produced and canceled of record. If she has any equity to be protected in the premises, she must be left to assert her right. As to the personal prop- erty, the attachment is not a lien upon it, and the bill being filed merely in aid of the lien of the attachment, there can be no relief granted in reference to that property. The complainant is entitled to costs.